Amanda Lee Doyle v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-164-CR

AMANDA LEE DOYLE APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

I.  Introduction

A jury convicted Appellant Amanda Lee Doyle of capital murder, and the trial court sentenced her to life in prison.  In five issues, Doyle complains that the evidence is factually insufficient to support her conviction, that the trial court erred by admitting into evidence a gruesome photograph and by limiting voir dire questioning as to the range of punishment, and that reversible error occurred when an absolutely disqualified juror sat on the jury and when the trial court refused to allow the defense to review that juror’s personal information card.  We will affirm.

II.  Factual Background

A. Non-Accomplice Witness Testimony

Cartrage Jones testified that on September 15, 2002, a group of his friends—including Dale Ponce-Duron, Kesey Frank, Justin Ebert, Jerry Jackson, and Jackson’s girlfriend, Stephanie Tacina—gathered at the Mack Park Apartments to drink and watch a football game.  Jerry and Stephanie argued, and Jerry shook Stephanie by the shoulders, causing her to hit her head on a wall and to fall to the ground.  Cartrage said that Stephanie did not seem to be badly hurt.  Jerry subsequently left with “the guys” to go to the store to buy beer.  
When the men returned to the apartments, they saw fire trucks, an ambulance, and police cars.  Police eventually arrested Jerry.  

Cartrage said that Doyle, the mother of Jerry’s baby, and Tymeshia Turner arrived in a white, four-door Hyundai and saw that Jerry was handcuffed.  Cartrage stated that Doyle was upset by Jerry’s arrest and blamed Stephanie for it.  Cartrage testified that Doyle repeatedly said, “We’re going to get that bitch.” 
 He stated that Dale, Kesey, Justin, and Tymeshia were also upset and that he thinks everyone in the group was saying that they were “going to get that bitch,” meaning Stephanie.  Cartage heard Doyle say that the group was going to the hospital to find Stephanie.  He testified that he told Doyle “not to go up there messing with that girl,” but Doyle did not listen to him. 
 Doyle handed her baby to Kelley Hughes, a friend who lived at the Mack Park Apartments, and Dale, Kesey, Justin, Tymeshia 
and Doyle all got in Doyle’s car and left. 

Lacey Lee, the assistant manager of the Mack Park Apartments at the time of this incident, testified that she remembered hearing a female voice cussing or yelling in the late afternoon and later saw two police cars in the parking lot. 
 She saw one gentleman in handcuffs and two females whom she had not seen before standing in the parking lot.  She described the two females—one was black and skinny; the other was white, bigger, and had a baby in her arms.  She also noticed a group of five people pacing and yelling profanity; she could tell that they were very angry about something.  Lacey noted that after the police left, Doyle was very angry; she was yelling at the other female.  Lacey said that Doyle was pacing and repeating, “We’re going to get that bitch.” 

Ivan Holbert testified that his girlfriend on September 15, 2002 was Kelley Hughes and that he went to her apartment on that date.  Cartrage told Ivan something that made him go outside.  Once outside, Ivan saw the police run a warrant check and arrest Jerry because he had an outstanding warrant. He saw Doyle and said that she was crying and upset and wanted to know where Stephanie had been taken.  Ivan said that he told Doyle to leave Stephanie alone and that Stephanie was not the reason for Jerry’s arrest.  Ivan recalled Doyle saying that if she found Stephanie, she was “going to beat her up.”  Ivan and Kelley kept Doyle’s baby because Doyle, Tymeshia, Dale, Kesey, and Justin left in Doyle’s car.  Ivan testified that as Dale got into the car he said:  “I put this on my HLV [high life villain] until I die.  When I find Stephanie, I’m going to kill her.”  The group returned thirty minutes later to drop off a baby bag, and Doyle said that she would be back to get her baby the next day. Kelley Hughes testified that she lived at the Mack Park Apartments in September 2002 and that she heard a thump outside during the late afternoon of September 15, 2002.  After checking on her kids, she went outside and saw a lady, who was wearing denim shorts and a green shirt
, lying on the ground.  Kelley asked Kesey, a black man who was outside, what had happened, and he said that the girl had hit her head on the wall.  Kelley took the girl into a nearby apartment, and the girl ended up leaving, walking towards the police station.   After Kelley went back to her apartment, she heard the sound of approaching alarms and sirens.  Later, she saw that police had arrived and handcuffed Jerry, Kesey, and a white man.  The police arrested Jerry but let the other men go.  Kelley remembered that by this time Doyle and Tymeshia had arrived in a white four-door car and she said they were present when Jerry was arrested.  Kelley said that Doyle and Tymeshia were mad and upset and that Doyle wanted to know why Jerry had been arrested.  Kelley stated that people in the group were yelling that they were going to beat up Stephanie.  The group left, and Kelley kept Doyle’s baby.  Kelley did not hear anyone say that he or she was going to kill Stephanie. 

Reese Morgan testified that on the night in question, he went to Denton to hang out with Jerry.  He could not find Jerry, so he eventually called Doyle. Doyle returned Reese’s call while she was with the group.  Doyle told him that Jerry had been arrested and “that something bad had happened.”  Doyle was worried that her mom might call Reese looking for her and asked Reese to tell her mom that she and her friends had been with Reese because she did not want her mom to find out that Jerry was in jail.  The next day, Reese gave Doyle $900 for Jerry’s bail. 

Tasia Hoffman testified that she is Doyle’s friend and that she stayed at Doyle’s house the night of September 14, 2002.  The next day around 2:00 or 3:00 p.m., Doyle, the baby, and Tymeshia took Tasia home.  Around 11:30 p.m., on September 15
, 2005 Doyle knocked on Tasia’s bedroom window.  Tasia went to the door and let Doyle in, and Doyle said, “Stephanie’s in the car.  Come outside and get your paper,” which Tasia understood to mean, “Come outside and fight her.”  Doyle told Tasia to look at her hands; Tasia saw that Doyle’s knuckles were red with blood.  

They went outside to Doyle’s car; Tymeshia was in the driver’s seat and Justin, Kesey, Dale, and Stephanie were in the back seat.  Tasia saw Stephanie and asked what had happened.  Tymeshia responded that Stephanie had gotten Jerry “locked up.”  Tasia noticed that Stephanie’s head was on the seat between Dale and Kesey and that she was wearing bleached denim shorts and a green halter top.  Tasia saw that Stephanie’s hair was orange, like it had blood in it, and that she had bruises, a burn, and whelps on her back.  Tasia thought that Stephanie ”looked like somebody was holding onto her, not letting her move[,] like she was trying to move[,] but she couldn’t.”  Tasia thought that Stephanie sounded like she was trying to breathe and was gasping for air.  Tasia said that Doyle asked her if they could leave Stephanie at Tasia’s house, and Tasia told her no.  Doyle then asked Tasia to come with them, but Tasia’s dad came outside and told her to go inside.  Doyle got in the car, and the group left. 

Tasia said that Doyle called her two or three times the next day.  Doyle came to Tasia’s house
 at around midnight the next day. 
 Tasia noticed that Doyle was distraught, in shock, and scared when she arrived.  They went to see if Stephanie’s body was still at a nearby
 trailer park where Doyle said the group had dumped it. 
 Tasia said that she did not look at the body; she covered her head with her shirt.  Doyle said, “Oh, my God, she’s still there,“ and then she started crying and said that Stephanie was dead.  Tasia stated that Doyle did not want Stephanie to die. 

Doyle then told Tasia about the events from the night before, including that Stephanie had been hit in the head with a brick and beaten and that the men in the back seat with Stephanie had burned her with cigarettes, choked her, and hit her with a gun.  Doyle told Tasia that she had hit Stephanie.  Doyle told Tasia that Kesey and Dale had dragged Stephanie out of the car by a belt, cut her throat, and stabbed her in the stomach with scissors.  Doyle said that Kesey had tried to break Stephanie’s neck.  Doyle told Tasia that they took the padding out of her car seats because they were bloody, that they obtained bleach from a friend named Brian Dunnelly so that they could clean the car, and that they burned all the “stuff.” 

After going out to the vacant lot near the trailer park with Doyle, Tasia called her ex-boyfriend, Calvin.  Calvin and his friend Dwayne arrived at Tasia’s about 3:00 a.m., and the three of them went to look at Stephanie’s body. Calvin then called the police. 

Detective Eddie Barrett testified that he received a deceased persons call on September 17, 2002.  He went to a vacant lot and found a deceased female wearing blue jean shorts, lying next to a pile of dirt.  He noticed that the victim had multiple stab wounds in the abdomen, a large laceration on her neck, and some burn marks across her face.  Detective Barrett spoke with Calvin, Dwayne, and Tasia and developed a list of suspects.  Detective Barrett also spoke with Doyle and obtained consent to search her white Hyundai.  He subsequently sent the car to be searched for any hair, blood, and fingerprints that might be present.  At Dale’s house, Detective Barrett found a piece of landscape brick and a grill.  He found another piece of landscape brick at Denton Regional Hospital.  He noted that the hospital surveillance tape showed Dale, Tymeshia, and Doyle at the hospital. 

Detective Chris Kemp testified that he responded to a dispatch on September 17, 2002 regarding a deceased person.  He testified that Stephanie had a very deep laceration from one side of her neck to the other side, numerous puncture wounds to her stomach area, and bruising on her arms.  He also saw the four-door pearl white Hyundai owned by Doyle.  Detective Kemp said that there was enough blood in the back seat area of the vehicle to cause him to suspect that Stephanie had been killed in the vehicle rather than in the field where her body was discovered. 

Constance Patton, a forensic DNA analyst
, testified that she analyzed the vehicle for blood stains.  She stated that the blood stains in the car matched Stephanie’s blood profile and concluded that Stephanie was the donor of the blood found in Doyle’s Hyundai.  Patton noted that no blood was recovered from the front seat and that no blood was detected on the bricks. 

Patricia Eddings, also a trace analyst, 
testified that the brick found at the hospital had no hair attached to it but that the brick found in Dale’s backyard had a single hair stuck to it.  She stated that the hair on the brick from Dale’s backyard
 had the same microscopic characteristics as Stephanie’s hair, and she opined that the hair on the brick could be Stephanie’s. 

Dr. Gary Sisler, who works at the Tarrant County Medical Examiner’s Office, testified regarding his autopsy on Stephanie’s body.  He found a large cut wound on Stephanie’s neck, other cut wounds on the left side of her neck, two cut wounds on the left side of her head, and bruises on her upper and lower extremities.  He described the large cut wound on Stephanie’s neck as seven inches wide and an average of one and a half inches deep.  He said that the large cut wound was fatal in and of itself, that scissors could have caused the wound, and that the wound was inflicted while Stephanie’s heart was still beating.  He said that he found eleven stab wounds, averaging four and a half inches deep, that were inflicted after her heart stopped.  Dr. Sisler explained that one of these stab wounds penetrated Stephanie’s abdominal aorta and would have been fatal.  He noted a burned area on Stephanie’s face.  Dr. Sisler did not note any cigarette burns in his report; however, he concluded at trial that Stephanie had suffered cigarette burns to her face because autopsy photos show the burned skin cracking and flaking.  Dr. Sisler described the blunt-force injury to Stephanie’s skull and opined that a brick could have caused that injury. He said that there was no evidence that Stephanie was choked with a belt or strangled with a shirt because he found no marks on her neck.  He indicated, however, that the autopsy would not have detected efforts to break Stephanie’s neck.  He ruled Stephanie’s cause of death as multiple sharp-force injuries and indicated that the manner of death was homicide. 

B. Accomplice Witness Testimony

Tymeshia Turner was the final witness and the only accomplice witness who testified.
(footnote: 1)  Tymeshia testified that she was best friends with Doyle and went to school with her.  Before September 15, 2002, Tymeshia had heard Doyle make threats against Stephanie; specifically, Doyle wanted to fight Stephanie and “get her out of the picture” because Doyle wanted to be with Jerry, who was dating Stephanie but was the father of Doyle’s baby. 

On September 15, 2002, Tymeshia was with Doyle, and they went to find Jerry because he was not returning Doyle’s pages.  When they got to the Mack Park Apartments, they saw that Jerry was handcuffed.  Tymeshia stated that Doyle was really mad and upset “because [Jerry] was over there [at the Mack Park Apartments] with Stephanie” and that because “he put his hands on Stephanie, he was going to jail, so it was all her fault.”  Doyle told Tymeshia, “I’m going to kill that bitch”; however, Tymeshia claimed that she did not know that Doyle meant it.  During this time, Tymeshia, Dale, and Kesey said things to incite Doyle so that she would fight Stephanie.  Doyle left her baby with Kelley and Ivan, drove the group in her car to her house to get baby things to take back to Kelley, and then planned to go to the hospital to fight Stephanie. 

Tymeshia testified that Doyle drove them to Denton Community Hospital, but Stephanie was not at that hospital.  Afterwards, they stopped at Kesey’s grandmother’s house, and Kesey came out with a gun, which turned out to be a pellet gun.  Justin stated to the group that he would pistol-whip Stephanie with it.  Then, the group went to Denton Regional Hospital and found out that Stephanie was there.  Tymeshia told Doyle to wait in the car because Tymeshia did not think that Stephanie would come with them if she saw Doyle.  Tymeshia went to Stephanie’s hospital room and told her that Jerry was in jail.  Tymeshia said that Jerry told her and Dale to come to the hospital and get Stephanie.  Dale stayed with Stephanie at the hospital; Tymeshia drove
 the group around
 in Doyle’s car, waiting for Stephanie to be discharged.  After getting money, gas, and cigarettes, the group discussed where they would take Stephanie.  Justin mentioned a trailer park near the hospital, and they went there to get a brick to use to knock out Stephanie.  Tymeshia confirmed that this conversation was held while Doyle was present.  

Doyle suggested a plan for how Tymeshia could pick up Stephanie; Tymeshia would drop off Doyle, Justin, and Kesey at the hospital entrance, pick up Stephanie from the hospital, and then pick up the group on the way out.  The group enacted this plan, and as soon as everyone was in the car, Kesey started punching Stephanie “really hard.”  Doyle, who was in the front passenger seat, turned around to watch and told Tymeshia to drive towards the highway.  Tymeshia turned up the music while Kesey was hitting Stephanie, and Doyle turned down the music.  Doyle said, “No, I want to hear this bitch scream.”  Tymeshia testified that all three men were punching Stephanie. Doyle yelled at Stephanie and told her that she needed to apologize to Doyle’s baby, that she had warned Stephanie “about fucking with Jerry,” and that Jerry had sent them to do this to her.  Stephanie said that she was sorry and that she was not going to mess with Jerry anymore.  Doyle turned around and started hitting Stephanie, punching her “head and stuff.”  Tymeshia testified that Kesey burned Stephanie with a cigarette and that Dale burned Stephanie with a lighter.
(footnote: 2)  Dale and Kesey placed a belt around Stephanie’s neck and choked her. They drove around for an hour or more, looking for a place to drop off Stephanie.  Doyle suggested Tasia’s house.  Tymeshia said that when they arrived at Tasia’s, Stephanie was not responding and seemed unconscious. Tymeshia mentioned that Tasia was going to “get her paper,” which was Doyle’s phrase.  However, Tasia’s dad came out and told Tasia that she could not leave.  

Doyle told Tymeshia where to drive, and they ended up at a field near a trailer park.  Everyone got out of the car, and Dale drug Stephanie out of the car by a belt placed around her neck and laid her face down behind a dirt pile. Kesey stepped on Stephanie’s back and shoulders, and Dale tried to break Stephanie’s neck.  Tymeshia saw Justin stomping on Stephanie.  Kesey took off Stephanie’s shirt and wrapped it around her head, and both Kesey and Dale used the shirt to try to twist Stephanie’s neck.  Kesey said, “The bitch won’t die.”  So, they turned over Stephanie, and Doyle retrieved a pair of cosmetology scissors from her car.  Doyle handed the scissors to Dale, and he started stabbing Stephanie.  Dale stabbed Stephanie’s throat and began cutting her throat.  Tymeshia heard air release when Dale cut Stephanie’s windpipe. Someone said that Stephanie was dead, and the group got back in the car.  As Doyle drove away, the group realized that they did not have Stephanie’s hospital band; they went back, and Dale retrieved it.  During the drive to Doyle’s house, Tymeshia recalled that Doyle told them not to worry about it—“nobody[’s] going to find out”; “it’s over and done.” 

When they arrived at Doyle’s house, Dale and Kesey took showers because they were soaked in Stephanie’s blood.  Tymeshia used a bag to gather up everyone’s clothes and shoes, along with Stephanie’s shirt and hospital band, and the scissors.  They all went to a car wash to clean out the car, and Tymeshia saw a lot of blood on the back seat.  The next day, they used bleach and a powder cleaner from Brian’s house to clean the car.  Dale and Justin took out the backseat of the car and cut out the seatbelts.  Tymeshia threw the landscape brick in Dale’s backyard and they used the barbecue grill to burn everything in the bag that they had collected the day before.  The next time that Tymeshia saw Doyle, Doyle told her about taking Tasia to see if Stephanie was dead. 

Tymeshia said that when this chain of events started, she did not expect Stephanie to die; all along, the plan was for a fight, and there was never any talk of killing Stephanie.  However, Tymeshia confirmed that throughout the ordeal Doyle never indicated she was having second thoughts about Stephanie’s beating. 

III.  Factually Sufficient Evidence to Support Conviction

In her first issue, Doyle argues that the evidence is factually insufficient to support her conviction for capital murder. 
 
The crux of Doyle’s contention is that there is insufficient evidence to corroborate Tymeshia’s accomplice witness testimony and that, absent this testimony, insufficient evidence exists 
to prove that she was criminally responsible as a party or 
co-conspirator.
(footnote: 3)  

The court of criminal appeals has held that the accomplice witness rule, Texas Code of Criminal Procedure article 38.14,
(footnote: 4) is a statutorily imposed sufficiency review that is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.  
Cathey v. State
, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999),
 cert. denied
, 528 U.S. 1082 (2000).  The accomplice witness rule is satisfied if there is some non-accomplice evidence that tends to connect the accused to the commission of the offense.  
Gill v. State
, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (citing 
Gosch v. State
, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991), 
cert. denied
, 509 U.S. 922 (1993)).  The corroborative evidence need not directly link the accused to the crime or be sufficient in itself to establish guilt beyond a reasonable doubt.  
Id.
 at 48; 
Gosch
, 829 S.W.2d at 777.
  The corroborative evidence may be circumstantial or direct.  
Gosch
, 829 S.W.2d at 777
; 
Paulus v. State
, 633 S.W.2d 827, 843 (Tex. Crim. App. [Panel Op.] 1981).

Although an appellant’s presence with the accomplice witnesses before and after the offense is insufficient to corroborate the accomplice witness’s testimony, it is an important circumstance to be considered.  
Cox v. State
, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992); 
see, e.g., Gill
, 843 S.W.2d at 49.  Motive and opportunity to commit the offense may be evidence which connects the accused to the offense.  
Cox
, 830 S.W.2d at 612; 
Paulus
, 633 S.W.2d at 846.  Moreover, ill will toward the deceased may be a factor which may corroborate accomplice witness testimony.  
See, e.g., Rodriquez v. State
, 508 S.W.2d 80, 83 (Tex. Crim. App. 1974).

Judicial experience shows that no precise rule exists to measure the amount of evidence required to corroborate accomplice witness evidence.  
Gill
, 873 S.W.2d at 48.  Each case must be evaluated on its own unique facts.  
Id.
  All facts and circumstances may be looked to as furnishing the necessary corroboration.  
Mitchell v. State
, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983), 
cert. denied
, 464 U.S. 1073 (1984).

We begin our analysis by determining whether the State met its burden under article 38.14 to offer non-accomplice witness evidence tending to connect Doyle with the offense.  
Under the requirements of article 38.14, we eliminate the evidence offered by the accomplice witness, here Tymeshia, from our analysis and examine the other evidence to determine if there is incriminating evidence that tends to connect Doyle as a party or co-conspirator to the commission of the capital murder.  
See
 
Hernandez v. State
, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997).

The record reveals that numerous non-accomplice witnesses heard Doyle make a threat against Stephanie.  Dale was heard to say before they left for the hospital in Doyle’s car that he would kill Stephanie, and no one, including Doyle, attempted to deviate from that plan.  There was no evidence admitted that Doyle was not present during any of the acts that the group perpetrated against Stephanie.  Instead, throughout the events, Doyle led the group and provided
 them with a means of transportation.

The direct evidence from the hospital surveillance cameras showed  Doyle, Tymeshia, and Dale at the hospital.  
Tasia’s testimony corroborated Tymeshia’s testimony that Doyle hit Stephanie
 and that the men hit Stephanie with a brick and a gun, beat her, burned her with a cigarette, and choked her.  Tasia testified that she saw Stephanie in Doyle’s car, and her description of Stephanie’s condition at that time was consistent with Stephanie having been beaten badly.  Tasia also saw blood on Doyle’s hands.  Tasia’s additional testimony based on Doyle’s statements to her—that Stephanie had been dragged from the car by a belt; that the men attempted to break Stephanie’s neck, and did cut her throat and stab her with scissors; that the group left Stephanie in a vacant lot; and that the group destroyed evidence to cover up the crime—further corroborates Tymeshia’s testimony regarding Doyle’s participation in the acts that led to Stephanie’s death.  After the group left Stephanie’s body in the lot,
 Tasia was able to lead her ex-boyfriend to the lot because Doyle had taken her to that location the day after the murder.  Furthermore, the brick, the evidence collected from Doyle’s car, and the autopsy added additional corroboration to Tymeshia
’s description of the September 2002 events connecting Doyle to the commission of the acts resulting in Stephanie’s death.

Excluding Tymeshia’s testimony, as mandated by article 38.14, the remaining evidence sufficiently corroborates Tymeshia’s accomplice witness testimony and satisfies the requirements of article 38.14.  
See Mitchell
, 650 S.W.2d at 808 (holding that evidence independent of accomplice witnesses tended to connect appellant with crime charged and sufficiently corroborated accomplice witness’s testimony).  We hold that Tymeshia’s accomplice witness testimony was sufficiently corroborated. 

We now analyze whether, considering all of the evidence—including Tymeshia’s sufficiently corroborated accomplice witness testimony—factually sufficient evidence exists to support the jury’s determination that Doyle was criminally responsible for Stephanie’s murder as a party or co-conspirator.  
See
 
Tex. Penal Code Ann.
 §§
 7.01-.02 (Vernon 2003) (listing criminal responsibility for parties and for conduct of another).
(footnote: 5)  

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

The accomplice witness 
testimony of Tymeshia made a case of capital murder as a party or co-conspirator against Doyle.  Tymeshia’s testimony revealed Doyle’s continuing role in the murder—from the planning stages with the threats to get Stephanie; to the group’s kidnaping of Stephanie; through the actual killing, in which Doyle handed over the scissors that were used to inflict the lethal cut to Stephanie’s throat; to Doyle’s participation in covering up the crime.  Additionally, there were numerous witnesses who placed Doyle with Stephanie before the murder and who described Doyle’s ill will toward Stephanie for dating the father of Doyle’s child.  Moreover, Tasia testified that she saw Stephanie, still alive, crumpled up in the back seat of Doyle’s car with the group; she saw Stephanie’s body after Stephanie was murdered; and heard Doyle’s story of the murder after Stephanie died.

Viewing all the evidence in a neutral light, favoring neither party, we conclude that factually sufficient evidence exists supporting the elements necessary for the jury to find Doyle guilty of murder as a party or co-conspirator.  
See
 
Tex. Penal Code Ann.
 §§
 7.01-.02.  Evidence supporting the verdict, taken alone, is not too weak to support the finding of guilt beyond a reasonable doubt, and the contrary evidence is not so strong that guilt cannot be proven beyond a reasonable doubt.  
Dotson v. State
, 146 S.W.3d 285, 295 (Tex. App.—Fort Worth 2004, pet. ref’d); 
see also Meeks v. State
, 135 S.W.3d 104, 112-13 (Tex. App.—Texarkana 2004, pet. ref’d) (finding sufficient corroborating evidence of accomplice testimony that tends to connect appellant to offense and holding evidence factually sufficient).  We overrule Doyle’s first issue.

IV.  No Harm Resulted From Limitations on Voir Dire Questioning

During voir dire, the following exchange took place:

[DEFENSE COUNSEL:] Okay.  Now, having – again, having done this a while, I’ve heard any number of responses to the question of can you consider the full range of punishment.  Specifically, can you grant probation to this defendant if you found her guilty of murder and you believed it was the right thing to do?

[PROSECUTOR:] Objection to improper question.

THE COURT:  Sustained.

[DEFENSE COUNSEL:] Sorry.  Can you assess a sentence if you found a defendant guilty of murder – can you assess [her] sentence at probation if you believed that it was the proper sentence to set?

[PROSECUTOR:] Same objection.

THE COURT:  Sustained.  You’re asking them if they can grant it or assess it, and the law requires them to be able to consider it.

[DEFENSE COUNSEL:] And I apologize for that.  That is correct.

What I need to find out is, can you consider probation for a defendant that you found guilty of the offense of murder if you believed it was the proper thing to do?  Now, I have actually heard in response to this question before someone say, well, sure, if I found them not guilty.  It doesn’t work that way.  Not guilty, they go home.  Okay.  We’re talking about somebody that, yes, indeed, you did find guilty of the offense, the lesser, in this case the offense of murder.

So let me ask Mr. Shelton.  Could you consider probation if you found the defendant guilty of murder if you thought it was the proper thing to do?

VENIREPERSON:  Yes.

[DEFENSE COUNSEL:] Mr. Moses?

VENIREPERSON:  Yes.

[DEFENSE COUNSEL:] Mr. Kirwan?

VENIREPERSON:  Yes.

[DEFENSE COUNSEL:] Mr. Cott?

VENIREPERSON:  Yes, sir.

[DEFENSE COUNSEL:] Ms. Howard?

VENIREPERSON:  Yes.

[DEFENSE COUNSEL:] Mr.Moore?

VENIREPERSON:  Yes.

[DEFENSE COUNSEL:] Ms. Santos?

VENIREPERSON:  Yes.

[DEFENSE COUNSEL:] Ms. Fish?

VENIREPERSON:  I’m not real clear on that one.

[DEFENSE COUNSEL:] Okay.  Obviously –

VENIREPERSON:  If they have been found guilty of murder, would I consider probation?

[DEFENSE COUNSEL:] The law requires that you consider the full range of punishment, which would include – which would include probation for murder.  

VENIREPERSON: I would consider it.  I would follow the law and consider it.

[DEFENSE COUNSEL:] And if you felt it was proper, could you give it?

[PROSECUTOR:] I object to improper question.

THE COURT:  Sustained.

[DEFENSE COUNSEL:] Your Honor, I believe I’m entitled to ask that in the proper circumstances, not only would they consider it but would they give it.

THE COURT: I don’t believe that you can ask that question.  That’s why I sustained the objection.

[DEFENSE COUNSEL:] I understand.  We’ll leave it with that.

Can you consider probation?

VENIREPERSON: I could consider probation.

In her third issue, Doyle maintains that the trial court erred by limiting the voir dire questions intended to establish whether the venirepersons were qualified as to the range of punishment, including probation.  Specifically, Doyle complains that she should have been allowed to ask the venirepersons whether they could “give or grant” probation if warranted by the proper circumstances and that the restriction placed on her voir dire examination resulted in a Sixth Amendment violation.  The State responds that Doyle’s question to the venirepersons as to whether they could give probation constituted an improper commitment question. 

The trial court has broad discretion over the process of selecting a jury.  
Barajas v. State
, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  Therefore, appellate courts should not disturb a trial court's ruling on the propriety of a particular question during voir dire absent an abuse of discretion.  
Id.
;
 Harris v. State
, 122 S.W.3d 871, 878 (Tex. App.—Fort Worth 2003, pet. ref’d).  A trial court abuses its discretion if it prohibits a proper question regarding a juror's views on an issue applicable to the case.  
Howard v. State
, 941 S.W.2d 102, 108 (Tex. Crim. App. 1996), 
cert. denied
, 535 U.S. 1065 (2002).  Additionally, a trial court abuses its discretion if it allows a question that attempts to commit the juror to a particular verdict based on a set of circumstances analogous to the case in question.
  See Atkins v. State
, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997); 
see generally Standefer v. State
, 59 S.W.3d 177, 179-84 (Tex. Crim. App. 2001) (setting forth three-prong test for determining improper commitment questions). 

Here, we decline to engage in the 
Standefer
 analysis for determining whether the questions asked were proper or improper commitment questions.  Assuming that Doyle was denied the ability to pose a proper question to the venire on probation, we apply a rule 44.2 analysis to determine the harm.  
See Rich v. State
, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005) (stating that trial court’s impermissible exclusion of a proper question during jury voir dire is subject to a harmless error analysis).  The
 trial court 
in this case assessed punishment, not the jury; we can conceive of no manner in which this alleged error influenced the jury’s verdict at guilt-innocence. 
 Doyle has offered no explanation concerning how her substantial rights were affected by the alleged improper limitation on voir dire when the trial court assessed her punishment. 
 The jurors’ alleged inability to give or grant probation
(footnote: 6) is not linked to any supposed bias to improperly convict her.  
After considering the entire record, including the accomplice witness testimony, physical evidence admitted for the jury’s consideration, the nature of the evidence supporting the verdict set forth above, the character of the alleged error and how it might be considered in connection with other evidence in the case, the jury instructions, the State’s theory and any defensive theories, closing arguments, voir dire, and whether the State emphasized the error, we cannot say that the trial court’s error, if any, in restricting voir dire was harmful.  
See id.
 at 577-78.
  Therefore, we overrule Doyle’s third issue.

V.  Failure to Raise Juror Disqualification Precludes Reversal

During the break after the State concluded its voir dire, Mr. Moses, one of the venirepersons, requested to speak to the attorneys: 

THE COURT:  Mr. Moses, what did you want to tell us, sir?

VENIREPERSON:  What I talked to you about this morning.  Back in 1967, I was –

THE COURT:  Ma’am, are you a juror in this case?

UNIDENTIFIED WOMAN: No.

(Woman left the courtroom)

THE COURT: Go ahead.

VENIREPERSON: Back in 1967 in Vietnam, I had a general court martial for misappropriation, felony offense, government funds, 30 days.  I didn’t go to the brig, but I just wanted – the scenario you brought up this morning, I just wanted to bring it up to make sure that if it came out later something wasn’t – yeah, I just wanted you to know.  I was broken one rank and got it back in 30 days and got an honorable discharge.  So I just wanted you to know.

THE COURT:  Okay.  Let me see if they have any questions.

[PROSECUTOR], do you have any questions?

[PROSECUTOR:] No, Your Honor.

THE COURT: [DEFENSE COUNSEL], do you have any questions?

[DEFENSE COUNSEL:] Was this a proceeding of some sort that they had, a court martial basically?

VENIREPERSON: Yeah, general – it’s just when you have – I’m about to choke to death.

You just have one commanding officer, and he pronounces judgment.  I just did something stupid and got caught.  Got drunk and got – we were mad at a gentleman, and did some stupid things.  I shouldn’t have done it.  And that was in 1967.  And like I said, I got my rank back within 30 days, and I was – I have an honorable discharge.

THE COURT: And in fact, you told me this morning you’ve served on juries since then, correct, sir?

VENIREPERSON: Yes, ma’am.  But I – I try to make sure that everybody knows just so that it’s not a problem.

[DEFENSE COUNSEL:] We appreciate your sharing with us.

I have no questions.

THE COURT: Thank you, sir.

At the conclusion of Doyle’s voir dire, the trial court read the names of the twelve jurors, including Mr. Moses.  After the jury convicted Doyle, she filed a motion for new trial and an amended motion for new trial, alleging that she had suffered significant harm by Mr. Moses’s service, because he was allegedly a disqualified juror. 

In her fourth and fifth issues, Doyle contends that the trial court committed reversible error by allowing Mr. Moses to sit on the jury and by refusing to allow her to review his juror information card.  The State responds that the trial court impliedly found that Mr. Moses was not absolutely disqualified, that the trial court did not abuse its discretion based upon the information before it, and that Doyle was not entitled to disclosure of Mr. Moses’s personal information because she failed to show good cause. 

A juror is absolutely disqualified if it appears that he had been convicted of theft or any felony.  
See 
Tex. Code Crim. Proc. Ann.
 arts. 35.16(a) (Vernon Supp. 2005), 35.19 (Vernon 1989).  We apply an abuse of discretion standard when reviewing a trial court’s ruling on whether a juror is absolutely disqualified.  
Chambers v. State
, 903 S.W.2d 21, 27 (Tex. Crim. App. 1995); 
Hammond v. State
, 799 S.W.2d 741, 744-45 (Tex. Crim. App. 1990), 
cert. denied
, 501 U.S. 1259 (1991); 
Loughry v. State
, 926 S.W.2d 382, 384 (Tex. App.—Fort Worth 1996, pet. ref’d).  A trial court’s ruling on an absolute disqualification is a question of fact.  
Chambers
, 903 S.W.3d at 27; 
Hammond
, 799 S.W.2d at 744-45; 
Loughry
, 926 S.W.2d at 384.

A conviction in a criminal case may be reversed on appeal on the ground that a juror in the case was absolutely disqualified from service if (1) the defendant raises the disqualification before the verdict is entered or (2) the disqualification was not discovered or brought to the attention of the trial court until after the verdict was entered and the defendant makes a showing of significant harm by the service of the disqualified juror.  
Tex. Code Crim. Proc. Ann.
 art. 44.46 (Vernon Supp. 2005).  Thus, the first issue presented here is whether Doyle raised the disqualification issue before or after the verdict was entered.

Mr. Moses came forward on his own accord to discuss with the parties his general court martial for misappropriation of government funds.  As shown by the testimony above, Doyle’s attorney asked one question, the court asked one question, and neither the State nor Doyle challenged Mr. Moses or objected to him serving on the jury.  Doyle urges us to conclude that her single inquiry into the nature of the proceeding—that is, whether it was a court martial—constitutes “raising” the issue of absolute disqualification before the verdict was entered for purposes of article 44.46.
(footnote: 7)  
Id.
  However, according to the Texas Court of Criminal Appeals, this single question falls short of the statutory criteria necessary to “raise” a disqualification issue.  
See Nelson v. State
, 
129 S.W.3d 108, 111, 113 (Tex. Crim. App. 2004). 

Nelson v. State 
involved facts almost identical to the present facts.  
Id. 
at 109.  In 
Nelson
, the Amarillo Court of Appeals held that a juror’s statements about his possible disqualification and a defense counsel’s subsequent conference with the judge and prosecutor satisfactorily “raised” the issue of juror disqualification before the verdict was rendered.
  
See id. 
at 110 (stating that the ground of the juror’s disqualification was preserved for review).  The court of criminal appeals reversed, holding that the disqualification issue had not been “raised”—Nelson did not assert an objection to the juror’s qualifications and instead told the court that he had no objection to the juror.  
Id.
 
at 113.  The court of criminal appeals
 held that Nelson “could have raised, but did not raise, the disqualification before the verdict was entered”—that is, the juror’s statements and defense counsel’s conference with the judge and prosecutor did not “raise” the issue, a specific objection was required.  
Id.

Here, as in 
Nelson
, after Mr. Moses disclosed that he had been subjected to a court martial for misappropriation of government funds, Doyle made no objection and did not challenge Mr. Moses.  Consequently, Doyle, like Nelson, did not “raise” disqualification before the verdict was entered.  Although the possibility of a juror’s absolute disqualification may come to light during voir dire, article 44.46(1) requires “the defendant” to raise the objectionability of the juror in some way prior to entry of the verdict.  
Tex. Code Crim. Proc. Ann.
 art. 44.46(1)
; see Nelson
, 129 S.W.3d at 111-13; 
Hernandez v. State
, 952 S.W.2d 59, 71 (Tex. App.—Austin 1997) (holding that, although possibility of juror’s disqualification was raised during voir dire, defense did not object to juror or seek his removal), 
judgm’t vacated on other grounds
, 957 S.W.2d 851 (Tex. Crim. App. 1998).  Because Mr. Moses’s potential disqualification was disclosed during voir dire, Doyle cannot fall under article 44.46's second standard for reversal—applicable when disqualification is not discovered until after entry of the verdict.  
Tex. Code Crim. Proc. Ann.
 art. 44.46(2).  According to 
Nelson
, our analysis concludes here.  
See 
129 S.W.3d at 113.  Doyle’s failure to “raise” the issue—Mr. Moses’s possible disqualification that she learned of before the verdict—by an objection to his qualifications or service means that her judgment of conviction may not be reversed under article 44.46. 
 
See id.
  Moreover, 
because we do not proceed to an article 44.46(2) analysis, we need not analyze Doyle’s fifth issue claiming she needed Mr. Moses’s juror information card to show
 
significant harm under article 44.46(2)
.

We hold that the trial court did not err by allowing Mr. Moses to sit on the jury or by refusing to allow Doyle to review Mr. Moses’s juror information card.
(footnote: 8)  We overrule Doyle’s fourth and fifth issues.

VI.  Photograph Was Not More Prejudicial Than Probative

In her second issue, Doyle argues that the trial court erred by admitting into evidence a gruesome photograph of Stephanie after her death.  Specifically, Doyle contends that the probative value of such photograph was substantially outweighed by the danger of unfair prejudice. 

The admissibility of a photograph is within the sound discretion of the trial judge.  
Paredes v. State
, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004).  We will not disturb a trial court’s ruling admitting or excluding evidence so long as its decision falls within the “zone of reasonable disagreement.”  
See Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh’g).

Under Texas Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  
Tex. R. Evid.
 403.  A rule 403 analysis by the trial court should include, but is not limited to, the following considerations:  (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent’s need for the evidence.  
Erazo v. State
, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).  A court may consider the following factors in determining whether the probative value of a photograph is substantially outweighed by the danger of unfair prejudice:  the number of photographs, the size of the photograph, whether it is in color or black and white, whether it is gruesome, whether the body is naked or clothed, and whether the body has been altered by autopsy.  
Reese v. State
, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000). Where pictorial evidence will help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a victim of a crime, the photograph is generally admissible.  
Harris v. State
, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983).  Photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect.  
Legate v. State
, 52 S.W.3d 797, 807 (Tex. App.—San Antonio 2001, pet. ref’d).  Overall, the photograph must be helpful to the jury; “[i]f there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.”  
Erazo
, 144 S.W.3d at 491-92.

State’s Exhibit 21 is a close-up of Stephanie’s head, focusing on the facial injuries themselves.  The trial court admitted and published the color photograph to the jury after Detective Barrett testified regarding where and how Stephanie was found; a substantial amount of time was not spent discussing the photograph.  The probative value of the photograph is high.  It provides strong visual evidence corroborating the testimony of Tymeshia, Detective Barrett, and a portion of Tasia’s testimony concerning how Stephanie was murdered, the injuries inflicted with the cigarettes, and the ultimate result of the events that took place on September 15, 2002.  
As the court of criminal appeals has stated, “Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions.”  
Chamberlain v. State
, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999), 
cert. denied
, 528 U.S. 1082 (2000)
.  Thus, although the photograph arguably depicts “disagreeable realities,” “[it] depict[s] nothing more than the reality of the brutal crime committed” and helped the jury to understand the verbal testimony.  
Id.
  

We hold that the probative value of State’s Exhibit 21 is not substantially outweighed by its prejudicial effect.  
See
 
Tex. R. Evid.
 403, 
Frank v. State
, No. 2-04-069-CR, 2005 WL 3526564, at *10 (Tex. App.—Fort Worth Dec. 22, 2005, no pet. h.) (holding probative value of State’s Exhibit 21—the same photograph of Stephanie that was admitted in the trial of Kesey Frank—was not substantially outweighed by its prejudicial effect).  Thus, the trial court did not abuse its discretion by admitting State’s Exhibit 21.  
See Paredes
, 129 S.W.3d at 539; 
Frank
, 2005 WL 3526564, at *10. 
 We overrule Doyle’s second issue.

VII.  Conclusion

Having overruled each of Doyle’s five issues, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: January 5, 2006

FOOTNOTES
1:
At the conclusion of the State’s direct examination, Tymeshia admitted that she had lied in previous statements to the police to protect herself, Doyle, and Justin.  She stated that she came to testify at trial because she wanted to take responsibility for her actions. 

2:
On cross-examination, Tymeshia admitted that she never saw Stephanie being burned, but she remembered Dale saying that he burned Stephanie in the eye.  

3:
The court’s charge to the jury contained instructions on criminal responsibility as a party and as a co-conspirator. 

4:
The accomplice witness rule provides that “[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.”  
Tex. Code Crim. Proc. Ann.
 art. 38.14 (Vernon 2005).

5:
Under section 7.01(a), which sets forth the law of parties, a person is 

criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.  
Tex. Penal Code Ann.
 § 7.01(a).  Section 7.02 reads as follows:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

(1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

(3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense. 

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed, by one of the conspirators , all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code Ann.
 § 7.02.

6:
None of the jurors stated that they could not consider probation.

7:
Although the State, in its brief and during oral argument, conceded that the issue of Mr. Moses’s qualification was discussed, the State points out that Doyle did not challenge Mr. Moses or object in any way to seating him and argues that Doyle has not suffered significant harm from Mr. Moses’s jury service.  In other words, the State agrees that the possibility of Mr. Moses’s disqualification came up during voir dire but not that the technical requirements of article 44.46(1) were met.  
Id.

8:
Moreover, based on the information before it, the trial court could have concluded that the offense that Mr. Moses described did not render him absolutely disqualified.  
See
 
Tex. Code Crim. Proc. Ann
. art. 35.16(a), 35.19.